DEBORAH M. SMITH
Acting United States Attorney

STEPHAN A. COLLINS
Assistant U.S. Attorney
222 West 7th Ave., #9, Rm. 253
Anchorage, AK 99513-7567
Phone: (907) 271-5071
Fax: (907) 271-1500
E-mail: stephan.collins@usdoj.gov
AK Bar No. 8911061


IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| IN THE MATTER OF THE APPLICATION OF THE UNITED STATES OF AMERICA FOR AN ORDER AUTHORIZING THE INTERCEPTION OF WIRE COMMUNICATIONS TO AND FROM:<br><br>CELLULAR TELEPHONE NUMBER (907)250-8322, BEARING INTERNATIONAL MOBILE SUBSCRIBER IDENTITY (IMSI) NUMBER 310560120593540: SUBSCRIBED TO BY SHEMSHEDIN LIMANI, 4126 E. 8th AVENUE, ANCHORAGE, ALASKA HEREIN REFERRED TO AS **TARGET TELEPHONE** | Misc. No. 3:06-mc-00022-JWS<br><br>**AFFIDAVIT IN SUPPORT OF APPLICATION**<br><br><br>**FILED UNDER SEAL** |

I.    INTRODUCTION

I, Brian L. Balega, being duly sworn, depose and state the following:

1. I am a Detective with the Anchorage Police Department assigned to enforce drug violations. As such, I am "an investigative or law enforcement officer of the United States", as defined within Section 2510(7) of Title 18, United States Code (USC), and am empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Section 2516 of Title 18 USC.

2. I am a Deputized Task Force Officer with the Drug Enforcement Administration (DEA), assigned to the Seattle Field Division, Anchorage District Office, Alaska.   As such I am authorized to investigate violations of federal law concerning Title 21, United States Code (USC). I have been a law enforcement officer for more than nine and one half (9 ½) years. I have a Bachelor of Occupational Education Degree in Human Services with emphasis in Criminal Justice.

3. As part of my duties as a Detective/Task Force Officer with the Drug Enforcement Administration, I investigate drug trafficking organizations, including their smuggling routes and the techniques that they use for transporting controlled substances such as marijuana, cocaine, methamphetamine, and heroin. My duties include investigating drug trafficking organizations, interviewing witnesses,

victims and suspects, identifying people involved, developing probable cause for cases, handling and processing various types of evidence, and assembling cases for prosecution. I have received specialized training in identification, field testing, and investigation of illegal drugs and drug trafficking techniques while attending the Anchorage Police Department Academy and other training conducted by the DEA. I have received specialized training as a task force officer at the DEA Training Academy. I have assisted other officers and detectives with controlled substance cases as evidence custodian, surveillance team member, photographer, entry/search team member, and handler of confidential and citizen informants. I have participated in drug cases and controlled delivery cases, assigning and directing other officers in the investigations. In 2004, I attended Basic Clandestine Laboratory Certification School in Quantico, Virginia, which deals with the investigation and processing of clandestine methamphetamine laboratories. In 2005, I attended Advance Clandestine Laboratory Certification School in Quantico, Virginia, which deals with supervising of investigation and the compliance with federal laws and regulation when processing of clandestine methamphetamine laboratories. In 2005, I attended Basic Asset Forfeiture School in Quantico, Virginia, which deals with investigation of assets and money obtained through illegal drug proceeds and the forfeiture of these items.

4. During the time I have been assigned to work drug investigations, I have become familiar with and used a number of investigative techniques including, but not limited to, questioning of witnesses, use of informants and undercover agents, use of physical surveillance, execution of search warrants, issuance of administrative and federal grand jury subpoenas, analysis of toll and financial records, and analysis of data derived from the use of pen registers and trap and traces.

5. At the present time, I am participating in a multi-agency investigation with the DEA, the Federal Bureau of Investigation (FBI), United States Immigration and Customs Enforcement (ICE), the Internal Revenue Service Criminal Investigation Division (CID), and the Anchorage Police Department (APD). The investigation centers on the importation, transportation, and distribution of cocaine and possible money laundering activities of a Drug Trafficking Organization (DTO) that operates in Alaska. The Targets and or Expected Interceptees identified below as members of this DTO are ethnic Albanians originally from the former Yugoslavian Republic, in particular what is now known as Macedonia. Some of the Targets and or Expected Interceptees are members of the same family. The Targets and or Expected Interceptees have maintained a strong cultural connection with one another while in Alaska and other

parts of the United States and as a result this common bond has made it difficult for law enforcement to gain close access to the inner workings of this DTO and its associates. The information contained within this affidavit is based upon my personal knowledge and participation in this particular investigation, and upon information I believe to be reliable from the following sources:

a.  Oral and written reports and documents about this and other investigations that I have received from agents and officers of the participating investigating agencies as well as other federal, state, and local law enforcement agencies;

b.  Physical surveillance conducted by the DEA, FBI, APD, ICE, and other federal, state, and local law enforcement agencies that have been reported to me either directly or indirectly;

c. Confidential sources;

d. Public records; and,

e. A review of pen registers information, telephone toll records, trap and trace information and subscriber information.

6.  This affidavit is made in support of an application to intercept for an initial period, not to exceed thirty (30) days, wire communications to and from the **TARGET TELEPHONE**.  The **TARGET TELEPHONE** is a cellular telephone

bearing International Mobile Subscriber Identity (IMSI) Number 310560120593540 with an assigned telephone number of **(907) 250-8322**. Hereinafter, I will refer to the cellular phone with IMSI 310560120593540, and telephone number **(907) 250-8322** as the **TARGET TELEPHONE**. The records for Dobson Cellular show that SHEMSHEDIN LIMANI**,** residing at 4126 E. 8th Ave, Anchorage, Alaska, is the subscriber for the **TARGET TELEPHONE**. Your affiant knows that even though SHEMSHEDIN LIMANI is the subscriber for the **TARGET TELEPHONE**, the actual user of this telephone is GZIM VESELI. To date, other than appearing to allow GZIM VESELI the use of the **TARGET TELEPHONE**, there is currently no probable cause to believe SHEMSHEDIN LIMANI is a member of the DTO.

7. The investigative goals of this intended interception of telephone conversations include (but are not limited to) discovering: (a) the identities of and methods of operation of all of the individuals in this organization who are involved with supplying this DTO with controlled substances, as well as with distributing and protecting these controlled substances; (b) the exact roles of these various individuals in the DTO; (c) the exact locations where members of this DTO obtain and store these controlled substances and the proceeds derived there from; and (d) the methods through which the DTO's members launder, distribute, or conceal the

assets acquired as a result of the DTO's drug trafficking activities.    Because

normal investigative procedures have been tried and failed, or reasonably appear

unlikely to succeed if tried or are otherwise too dangerous to try, this application

for authorization to intercept telephone conversations is being sought to achieve

these investigative goals.

8.  As a result of my law enforcement experience, my personal participation

in this investigation, and my knowledge from reports and conversations with other

law enforcement officers, I believe the facts contained below in this affidavit

establish probable cause to believe that the membership of the DTO have

committed, are committing, and will continue to commit offenses enumerated in

Title 21 and 18 of the United States Code, specifically:

a. Title 21, United States Code, Section 841 - To Distribute and to

Possess With Intent to Distribute a Controlled Substance, namely Cocaine;

b.  Title 21, United States Code, Section 843 (b) - Use of a

Communication Facility, to wit a Telephone, to Commit, Facilitate, or Further the

Commission of a Title 21 United States Code drug felony offense;

c. Title 21, United States Code, Section 846 - Conspiracy to Distribute

and to Possess with Intent to Distribute a Controlled Substance; and

d.  Title 21, United States Code, Section 856 -  Establishing or

Maintaining a Business or Place for the Purpose of Manufacturing, Distributing, or

Use of Controlled Substances;

e. Title 18, United States Code, Sections 1956 and 1957 - Laundering

of Monetary Instruments and Engaging in Monetary Transactions of Property

Derived from Specified Unlawful Activities as Described in Title 18, United States

Code, Section 1956(c)(7)(C), and Conspiracy to Commit the Foregoing in

Violation of Title 18, United States Code, Sections 1956(h) and 1957.

9.  Furthermore, based upon the investigation in this case to date, as set forth

below, there is probable cause to believe the following:

a. The Expected Interceptees, and others currently unknown, are using

the **TARGET TELEPHONE** in connection with the commission of the above-

named offenses;

b. Particular wire communications of the Expected Interceptees, and

others currently unknown, concerning the above-named offenses will be obtained

through the interception of wire communications over **TARGET TELEPHONE**;

c.  The communications will likely identify and provide admissible

evidence concerning: (I) the names, telephone numbers, and residential addresses

of the sources of supply for the controlled substances the DTO distributes, the

transporters of these controlled substances, as well as the financiers, the retail

distributors, and customers of these controlled substances; (ii) the dates, times, and

places for the commission of the Targets and or Expected Interceptees's drug

trafficking and possible money laundering activities; (iii) the location, receipt,

administration, control, management, and disposition of the controlled substances

and the proceeds derived from that activity; (iv) the nature, scope, places, and

methods of operation of the DTO and its illegal activities; and (v) the existence and

location of records evidencing drug trafficking and possible money laundering.

## II. TARGETS AND OR EXPECTED INTERCEPTEES

The membership of the DTO includes the Targets and or Expected

Interceptees who are identified below, as well as others currently unidentified.

1.    NEDZAT MIFTARI, a.k.a. Nick, is a distributor within the DTO and

believed to be a leader in this organization. He is a white male, born on January 20,

1964, with social security number 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. He is a naturalized United States

citizen, born in Macedonia. NEDZAT MIFTARI maintains an Alaska state

driver's license in the name of NEDZAT MIFTARI, with an address of 704 Pearl

Drive, Anchorage, Alaska. Surveillance units and subscriber information from

tolls however reflect that NEDZAT MIFTARI also has resided at 3314 Eide Street,

Anchorage, Alaska. Records indicate that NEDZAT MIFTARI used the 3314 Eide

Street, Apartment #1, Anchorage, Alaska address for Alaska Permanent Fund

applications for the years 2000 thru 2004.  NEDZAT MIFTARI is also believed to

have established a residence at 1571 North Heather Meadows Loop, Anchorage,

Alaska.  NEDZAT MIFTARI's criminal history includes no drug related arrests or

convictions.

     2.     BEKIR SHABANI, a.k.a. Chile, is believed to be a distributor within

this organization.  He is a white male, born February 17, 1975 with a social

security number of 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.  BEKIR SHABANI's listed country of birth is

Yugoslavia.  According to Alaska Department of Motor Vehicles, BEKIR

SHABANI's address is 1040 W. 27th, Apt. 212, Anchorage, Alaska.  However,

surveillance has identified BEKIR SHABANI's residence as 1101 Crowberry,

Anchorage, Alaska.  BEKIR SHABANI's Alaska Driver's License number is

6547902.  BEKIR SHABANI's criminal history includes one 1996 non-felony

drug conviction.

     3.     AZEM LIMANI, who is also known as Zach, is a white male, born on

May 8, 1969, social security number 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.   He is a naturalized United

States citizen, born in Yugoslavia. Based on pen register information and

information obtained from another related financial fraud investigation, law

enforcement suspects AZEM LIMANI is facilitating the DTO's criminal activities

by providing assistance in the concealing of assets or proceeds obtained from the DTO's drug trafficking activity and therefore he is listed as a target. AZEM LIMANI maintains an Alaska State driver's license in that name with an address of 11200 Briggs Court, Anchorage, Alaska. AZEM LIMANI's criminal history includes one 1999 felony drug related conviction.

4.    AGIM DELLOLI is a white male born October 14, 1967 with a social security number of 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. Per Alaska Department of Motor Vehicles records, AGIM DELLOLI's listed address is 7310 Cantonment Ct, Anchorage, Alaska. His Alaska Drivers License number is 6795145. During an earlier part of the drug trafficking investigation in this matter, AGIM DELLOLI was dealing cocaine in association with NEDZAT MIFTARI. Recent information has failed to connect AGIM DELLOLI with NEDZAT MIFTARI's recent drug trafficking activities. As a result of a related financial investigation in this matter, however, financial records have connected AGIM DELLOLI with AZEM LIMANI in the commission of financial institution fraud and related money laundering that may be assisting the drug trafficking activities listed in this affidavit. AGIM DELOLLI's criminal history contains no drug related arrests or convictions.

5.    GZIM VESELI, a.k.a. Jimmy, is believed to be a distributor within this organization. He is a white male, born on November 27, 1975, social security

number 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.  GZIM VESELI maintains an Alaska driver's license in the

name of GZIM VESELI, with an address of 331 W. 33rd #7, Anchorage, Alaska.

Law enforcement surveillance of GZIM VESELI has shown that he resides at 731

S. Bragaw, Anchorage, Alaska.  GZIM VESELI's criminal history includes no

drug related arrests or convictions.

6.    AJDIN DZAFERI, a.k.a. Joe, is believed to be a distributor within this

organization.  He is a white male born September 20, 1956 with a social security

number of 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.  AJDIN DZAFERI's listed country of birth is Yugoslavia.

AJDIN DZAFERI's listed address per Alaska Department of Motor Vehicles is

5050 Anne Hathaway Circle, Anchorage, Alaska.  AJDIN DZAFERI's Alaska

Driver's License number is 6616368.  AJDIN DZAFERI's criminal history

includes no drug related arrests or convictions.

7.    ZAIM SELIMOSKI, a.k.a. Zach,  is believed to be a distributor within

this organization.  He is a white male, born on October 14, 1965, with social

security Number 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.  He is a naturalized United States citizen, born in

Macedonia.  ZAIM SELIMOSKI maintains an Alaska driver's license in the name

of ZAIM SELIMOSKI, with an address of 3402 Dorbrandt Street, Space #44,

Anchorage, Alaska.  Law enforcement surveillance of ZAIM SELIMOSKI,

however, has shown that he may reside at 3921 Randolph Street.  Furthermore,

ZAIM SELIMOSKI provided this address to the Anchorage Police Department during the course of a traffic stop initiated upon him by the Anchorage Police Department in August 2005.  ZAIM SELIMOSKI has no known criminal history.

## III. PROBABLE CAUSE

The information provided and the conclusions contained in this affidavit are based upon the following: (a) the use of pen registers; (b) toll records; (c) physical surveillance; (d) law enforcement controlled drug purchases; (e) confidential source information; (f) public records; and, (g) oral and written reports and documents.  Since this affidavit is being submitted for the limited purpose of securing authorization for the interception of wire communications, I have not included each and every fact known to me concerning this investigation.  I have set forth only the facts I believe are needed to establish the necessary foundation for an order authorizing the initial interception of wire communications to and from the **TARGET TELEPHONE**.

### A. Confidential Sources

As detailed in this probable cause section as well as the section below describing the availability of confidential sources, law enforcement has interviewed a number of confidential sources during the course of this investigation. These sources, however, do not have information about, or access to

the sources of supplies or the TARGETS and or Expected Interceptees to the extent necessary to achieve the stated goals of this investigation. Other than the confidential sources discussed in this affidavit, your affiant does not know of any other individual who could act successfully as a confidential source in this investigation, either now or in the future, due in part to the fact that your affiant has not been able to identify all of the members of the organization.

To establish probable cause for the interception on the **TARGET TELEPHONE**, your affiant will be relying upon information from four confidential sources discussed in the following section: DEA1, DEA2, DEA3, DEA4, and FBI3.

### DEA1

I.     From April 2001, to present, a confidential source referred to herein as DEA1, began cooperating with the United States after law enforcement discovered DEA1 was dealing cocaine. Neither the United States nor the State of Alaska has yet charged DEA1 in relation to these drug trafficking activities. DEA1 is cooperating with law enforcement in order to receive possible sentencing/adjudicatory consideration in relation to DEA1's drug trafficking activity.    DEA1 has been compensated for financial expenses incurred during DEA1's involvement in this investigation.

ii. DEA1 was never a member of the DTO identified in this affidavit and has no first hand knowledge of either the inner workings or internal structure of the DTO other than what is more fully developed below. DEA1, however, has provided information about who DEA1 believes to be the actual head of the DTO and the relationship of others to the criminal activities of the DTO who are not identified in this affidavit. DEA1 has identified DEA3, describe below in this affidavit, as the person who DEA1 believes is the most prolific Anchorage area cocaine trafficker of whom DEA1 was aware. DEA1 stated he/she did not believe he/she could purchase cocaine directly from DEA3. Law enforcement, however, has not been able to corroborate this particular information and is unlikely to be able to corroborate this information without gaining independent access to the inner workings of the DTO. Based on historical information of the criminal activities of DEA3, law enforcement believes DEA1 is mistaken about the identity of the true head of the DTO. Therefore, your affiant is not relying upon this particular information to establish probable cause for the interception of the

**TARGET TELEPHONE**.

iv. During the earlier portion of the investigation described in this affidavit, DEA1 purchased cocaine from NEDZAT MIFTARI and AGIM DELLOLI. DEA1 has also purchased cocaine from AJDIN DZAFERI.

v.  Law enforcement has been able to corroborate the  other information DEA1 has provided through the use consensually monitored  telephone calls to arrange cocaine purchases, surveillance, records checks, telephone toll analysis, and information received as a result of debriefings of other sources of information who are unaware of DEA1's cooperation. Your affiant believes evidence and information provided by DEA1 is trustworthy and reliable.  DEA1 is prepared to testify in court.

### DEA2

I.      Beginning in December 2004, a confidential source referred to herein as DEA2 began providing information to the United States regarding NEDZAT MIFTARI whom DEA2 asserted distributed cocaine in Anchorage, Alaska. DEA2's motivation for assisting law enforcement arose out of DEA2's belief NEDZAT MIFTARI and his associates distribute controlled substances, "flaunt" their drug proceeds by buying high value items, and do not entertain fears of being discovered or arrested by law enforcement while other European immigrants strive and work hard to provide for their families and maintain an acceptable household income.  DEA2 is originally from the same region of Europe as the TARGETS and or Expected Interceptees.  DEA2 is concerned for his/her family's safety as well as his/her personal safety if DEA2's cooperation with law enforcement becomes

250-8322
Affidavit                          Page 16 of  74

known to the TARGETS and or Expected Interceptees. DEA2's criminal history contains no arrests or convictions for any felony offense or any offense involving dishonesty.

ii. DEA2 provided the investigators information about NEDZAT MIFTARI's telephone number, his residences, and the vehicles NEDZAT MIFTARI drives. The investigators corroborated DEA2's information through the use of recorded telephone calls, records checks, surveillance, telephone toll analysis, and debriefing other sources of information who are unaware of DEA2's cooperation. Your affiant believes evidence and information provided by DEA2 is trustworthy and reliable. DEA2, however, is reluctant to be called as a witness.

iii. DEA2 has called NEDZAT MIFTARI and ZAIM SELIMOSKI to attempt the purchase of cocaine and to possibly introduce an undercover agent to them. DEA2 has thus far been unsuccessful in his/her attempts to purchase controlled substances from or to introduce an undercover agent to either of these two.

iv. On July 20, 2005, DEA2 provided additional information about several individuals who DEA2 suspected of being involved in the distribution cocaine in Anchorage. DEA2 stated that with the money derived from drug trafficking, these individuals had purchased several restaurants and other businesses throughout

250-8322
Affidavit                          Page 17 of 74

Anchorage. DEA2 particularly identified NEDZAT MIFTARI and AZEM

LIMANI as being involved in financial transactions involving proceeds of drug

related activity.

      v. DEA2 stated that some of these individuals were engaged in an attempt

to build a subdivision in Anchorage and were using First National Bank of Alaska

to obtain financing for these projects. DEA2 specifically identified the loan officer

with First National Bank who had assisted NEDZAT MIFTARI and AZEM

LIMANI in obtaining the financing for these projects. DEA2 had learned the

name of the loan officer from overhearing AZEM LIMANI mention the loan

officer's name during discussions about his real estate transactions. As a result of

the related financial investigation law enforcement is conducting of the TARGETS

and their associates, law enforcement discovered that the loan officer DEA2 had

named was in fact the loan officer who authorized the numerous loans AZEM

LIMANI used to finance the purchase of several pieces of real property. To date,

law enforcement has developed probable cause to believe that AZEM LIMANI has

obtained several million dollars worth of real estate assets through fraudulently

obtained loans, specifically by misrepresenting his annual income and net worth,

which loans he has often obtained through the use of nominee purchasers, who also

misrepresent their income and net worth.

**DEA 3**

I. Beginning on October 29, 2004, a confidential source referred to herein as DEA3 voluntarily contacted the government to provide law enforcement with background information pertaining to the drug trafficking activities of NEDZAT MIFTARI. A local attorney accompanied DEA3 during this meeting. DEA3 stated that NEDZAT MIFTARI primarily dealt drugs from his residence and that he had surveillance cameras on the outside of the residence. DEA3 stated NEDZAT MIFTARI had historically sold cocaine in Anchorage for the past fifteen years and that NEDZAT MIFTARI considered himself "untouchable."

ii. DEA3 stated that the last time NEDZAT MIFTARI held a legitimate job was in 1998. DEA3 further related that in May 2003, NEDZAT MIFTARI bought a Dodge Viper, valued in excess of $60,000.00 from a local car dealer and that he put a $30,000 down payment on the vehicle. DEA3 stated NEDZAT MIFTARI paid $12,000 to have the vehicle shipped to Macedonia. DEA3 also stated NEDZAT MIFTARI had put all of his large assets in the name of his brother. DEA3 stated NEDZAT MIFTARI owned the apartment complex in which he has an apartment, but that the building is recorded his brother's name. DEA3 stated that most of NEDZAT MIFTARI's money was in a Swiss bank account, but DEA3

did not known the name of the bank or in what name NEDZAT MIFTARI has

opened the account.

iii. DEA3 did not provide any self incriminating information about DEA3's

involvement with the criminal activities of the DTO described in this affidavit.

Law enforcement, however, believes DEA3 is a participant in financial crimes

either directly or indirectly associated with the DTO organization. Law

enforcement has developed probable cause in a separate but related financial

investigation to believe DEA3 is actively involved in committing federal money

laundering and financial institution crimes in relation to obtaining financing to

purchase real estate. DEA3's stated motivation for cooperating with law

enforcement arose out of threats NEDZAT MIFTARI made toward DEA3's

family.

iv. In early January, 2006, the same local attorney who accompanied DEA3

in October, 2004 contacted law enforcement on behalf of DEA3. The attorney

related that DEA3 had provided further information linking ZAIM SELIMOSKI

with NEDZAT MIFTARI's drug trafficking activities in Anchorage, Alaska. The

attorney provided an accurate physical description of ZAIM SELIMOSKI.

v. In early February, 2006, DEA3 again provided additional information

through the local attorney. The information the attorney provided on DEA3's

250-8322
Affidavit                          Page 20 of 74

behalf connected AJDIN DZAFERI to NEDZAT MIFTARI's drug trafficking activities. The attorney also relayed information about NEDZAT MIFTARI's recent purchase of a new home in South Anchorage, for which NEDZAT MIFTARI was reported to have put $70,000 in cash down on the home and another $32,000 in cash for the furnishings. On a later date, DEA3 provided the address for the new home as 1571 North Heather Meadows.

vi. Investigators have corroborated DEA3's information by reviewing documentation related to the purchase and shipment of the expensive vehicle to Macedonia, by surveillance of NEDZAT MIFTARI's residences, by review of telephone toll analysis, and by reviewing information provided by other sources of information that are unaware of DEA3's cooperation with law enforcement. Law enforcement has corroborated through telephone records and a trash search that NEDZAT MIFTARI now lists 1571 North Heather Meadows as his residence. Recording documents for this property list his brother as the owner of this property. DEA3 is reluctant to be called as a witness. Your affiant believes the information DEA3 provided about the illegal activities of NEDZAT MIFTARI, AJDIN DZAFERI, and ZAIM SELIMOSKI is trustworthy and reliable.

vii. DEA3 is not willing to testify in court because of DEA3's concerns for the safety of DEA3's family. DEA3's criminal history includes a misdemeanor conviction for a drug offense.

**DEA4**

I.      On December 1, 2004, a confidential source, referred to herein as DEA4, contacted the Anchorage Police Department. DEA4 identified individuals listed in this affidavit as being TARGETS and or Expected Interceptees are engaged in drug trafficking activities related to the DTO. However, at the time DEA4 provided law enforcement with this information, DEA4 did not provide any self incriminating information that would connect DEA4 with the DTO or its illegal activities. At the same time, law enforcement had no information connecting DEA4 to the illegal activities of the DTO. Since the time DEA4 came forward, however, law enforcement has developed probable cause to believe DEA4 is involved in illegal activities associated with the DTO. DEA4 is one of the individuals specifically identified in this affidavit as a Target and or Expected Interceptee. DEA4 is therefore subject to prosecution for the violations of Title 21 and 18 set forth in this affidavit. DEA4 did not want to work with law enforcement in this investigation and will not testify in behalf of the government. DEA4's criminal history contains no arrests or convictions for any drug related

offense and has no reported arrests or convictions for any offense involving

dishonesty.  Law enforcement has been able to corroborate information provided

by DEA4  through the use of recorded telephone calls, records checks,

surveillance, telephone toll analysis, and debriefing other sources of information

who are unaware of DEA4's cooperation.  Despite DEA4's failure to provide any

self incriminating information, based on law enforcement's  corroboration of

DEA4's information, your affiant believes the information DEA4 provided is

reliable.

**FBI3**

I. From October 2005 to date, a witness cooperating with the FBI Anchorage

Office, hereafter referred to as FBI3, has provided assistance and information to

this investigation, which has been corroborated by toll record analysis and police

surveillance.  FBI3 has not been paid for his/her services.  FBI3 is working to

mitigate FBI3's involvement with the DTO that is the subject of this investigation.

FBI3 stated to law enforcement that he/she recently was on probation in the State

of New York for violation of state fraud statutes. Your Affiant was not able to

verify this information through law enforcement resources.  FBI3 has no verifiable

criminal history at this time.

ii. During a law enforcement interview, FBI3 identified a suspect known to FBI3 as ZAIM SELIMOSKI, a.k.a. ZACH. FBI3 stated ZAIM SELIMOSKI was a cocaine distributor from whom FBI3 has purchased cocaine on several occasions. FBI3 stated he/she would call (907) 227-4726 to arrange for the purchase of cocaine. FBI3 has no information about the TARGETS mentioned in this affidavit. FBI3 attempted to work with law enforcement by purchasing cocaine from ZAIM SELIMOSKI, but was unsuccessful because ZAIM SELIMOSKI developed suspicions that FBI3 was working with law enforcement. Based on law enforcement surveillance of a contact between FBI3 and ZAIM SELIMOSKI before FBI3 agreed to meet with law enforcement, your affiant believes FBI3' information is trustworthy and reliable.

**B. Controlled Buys of Cocaine**

### PRIOR INVESTIGATION

1. Beginning in approximately March 2001 and continuing through May 2002, DEA1 made a series of law enforcement controlled purchases of ounce quantities of cocaine first through AGIM DELLOLI and NEDZAT MIFTARI working together, and eventually directly from NEDZAT MIFTARI. Between March 30 and May 3, 2001, DEA1 purchased approximately four ounces of cocaine from AGIM DELLOLI while he was still working with NEDZAT

MIFTARI. Throughout this entire investigation, DEA1 purchased cocaine with pre-recorded government buy funds.

2. On April 4, 2001, during a law enforcement interview of DEA1, DEA1 identified NEDZAT MIFTARI, a.k.a. Nick, as a person from whom DEA1 had purchased cocaine for three to four months prior to DEA1 assisting law enforcement. DEA1 stated NEDZAT MIFTARI boasted that historically he sold cocaine in the Anchorage area for fifteen years. DEA1 stated he/she contacted NEDZAT MIFTARI through a local pager and also through a local telephone number.

3. DEA1 stated he/she met NEDZAT MIFTARI through AGIM DELLOLI. DEA1 stated he/she originally purchased ounces of cocaine from AGIM DELLOLI who later introduced DEA1 to NEDZAT MIFTARI. DEA1 stated that when he/she would call NEDZAT MIFTARI, DEA1 would tell NEDZAT MIFTARI how much cocaine DEA1 wanted and thereafter DEA1 would meet with NEDZAT MIFTARI to complete the deal. DEA1 stated that NEDZAT MIFTARI usually charged $1,400 per ounce.

4. On July 11, 2001, during one of the controlled purchases, DEA1 purchased one ounce of cocaine directly from NEDZAT MIFTARI. During this transaction, NEDZAT MIFTARI made it clear to DEA1 that he did not want

DEA1 informing AGIM DELLOLI of their transaction. NEDZAT MIFTARI told DEA1 that he was going to leave his pager with and turn the cocaine business over to AGIM DELLOLI. NEDZAT MIFTARI, however, then told DEA1 to call him instead of AGIM DELLOLI when DEA1 wanted to buy cocaine purchases.

5. On September 21, 2001, NEDZAT MIFTARI sold DEA1 one ounce of cocaine during a controlled buy. During that transaction, NEDZAT MIFTARI told DEA1 he was looking to obtain a kilogram of cocaine, and told DEA1 to keep his/her eye out and to let NEDZAT MIFTARI know if DEA1 found a source for this quantity. DEA1 informed law enforcement that during the deal, NEDZAT MIFTARI made a phone call to a person who DEA1 believed was a source of cocaine for NEDZAT MIFTARI. Toll records indicated NEDZAT MIFTARI called Domingo FELIZ-POLANCO. As a result of another investigation, law enforcement was aware that FELIZ-POLANCO dealt cocaine. DEA1 stated NEDZAT MIFTARI called FELIZ-POLANCO to obtain eight ounces of cocaine. Law enforcement developed no further information about the suspected eight ounce purchase from FELIZ-POLANCO and no criminal charges were ever filed against him arising out of the other investigation.

7. After this transaction, because law enforcement resources in Anchorage, Alaska were reassigned to another large scale drug trafficking organization

investigation, the investigation of NEDZAT MIFTARI and his organization was suspended until the beginning of 2005.   Laboratory analysis confirmed the presence of cocaine in all of the drug exhibits purchased during this time.

### CURRENT INVESTIGATION  JANUARY 2005 TO PRESENT

8.  On January 1, 2005, DEA1 called to inform your affiant that NEDZAT MIFTARI had called DEA1 to arrange a meeting.   During their subsequent meeting, NEDZAT MIFTARI informed DEA1 that he was lately thinking he wanted to get out of the business of dealing drugs.   NEDZAT MIFTARI then informed DEA1 that he was currently out of drugs but expected to obtain some cocaine in a couple of days.   A review of NEDZAT MIFTARI's telephone records for this date revealed that he contacted ZAIM SELIMOSKI five times and contacted the telephone number (907) 360-3582, which is subscribed to AJDIN DZAFERI, but which law enforcement believes BEKIR SHABANI actually uses, eight times.

9.  On January 27, 2005 at approximately 9:45 p.m., law enforcement initiated surveillance of ZAIM SELIMOSKI.   At one point, law enforcement followed ZAIM SELIMOSKI to 1834 Juneau Street, Anchorage, Alaska, which law enforcement believes is the residence of a Rae Ann Syverson.   At approximately 12:02 a.m., law enforcement eventually observed ZAIM

SELIMOSKI meet with NEDZAT MIFTARI, BEKIR SHABANI, and several other unidentified persons.

10. On February 7, 2005 at approximately 10:30 p.m., law enforcement again initiated surveillance of ZAIM SELIMOSKI. Law enforcement observed ZAIM SELIMOSKI meet with AJDIN DZAFERI and BEKIR SHABANI at a local bar.

11. On February 8, 2005, law enforcement again followed ZAIM SELIMOSKI to a local bar, where he was observed meeting with BEKIR SHABANI and also NEDZAT MIFTARI. At approximately 12:22 a.m. on February 9, law enforcement instructed DEA1 to go to the local bar and try to engage NEDZAT MIFTARI in drug related conversation. DEA1 eventually met with NEDZAT MIFTARI, who informed DEA1 that he was still willing to deal cocaine and that DEA1 could still contact him by calling the same cell phone number that he had used in the past for future cocaine deals.

12. On February 9, 2005, during the same trip to meet NEDZAT MIFTARI at the local bar, DEA1 also spoke to BEKIR SHABANI about the possibility of arranging cocaine deals. BEKIR SHABANI provided DEA1 with the cell phone number (907) 360-3582 as a number DEA1 could call to arrange future cocaine deals. Cell phone records show (907) 360-3582 is a number subscribed to AJDIN

DZAFERI.  At the direction of law enforcement, DEA1 subsequently attempted to arrange two cocaine deals with BEKIR SHABANI, but on each occasion BEKIR SHABANI directed DEA1 to deal instead with NEDZAT MIFTARI.

13.  On February 9, 2005, between approximately 6:18 p.m. and 8:00 p.m., while law enforcement observed, NEDZAT MIFTARI sold DEA1 one ounce of cocaine for $1,600.00.  Laboratory analysis confirmed the presence of cocaine in this drug exhibit. A review of telephone calls NEDZAT MIFTARI made on this date revealed that he contacted ZAIM SELIMOSKI in the early morning hours and that he contacted the telephone number (907) 360-3582, the number BEKIR SHABANI had provided DEA1 on February 9.  This later telephone number was called seven times.

14.  On February 16, 2005, NEDZAT MIFTARI called DEA1 and asked to meet with DEA1 at NEDZAT MIFTARI's residence.  During the subsequent meeting, NEDZAT MIFTARI handed DEA1 a Ziploc bag containing suspected cocaine.  Laboratory analysis confirmed the presence of cocaine in this drug exhibit.  A review of NEDZAT MIFTARI's telephone contacts for February 16, 2005, revealed he had three contacts with (907) 360-3582, BEKIR Shabani's suspected telephone number.  NEDZAT MIFTARI also had contact with two telephones listed as being subscribed to ZAIM SELIMOSKI.

15.  During the late evening hours of March 22, 2005, law enforcement investigators conducted surveillance of BEKIR SHABANI.  During this surveillance, the investigators observed BEKIR SHABANI drive to and enter AJDIN DZAFERI's house located at 5050 Anne Hathaway Street, Anchorage, Alaska.  At AJDIN DZAFERI's residence, the investigators also saw several vehicles parked nearby, including one registered to ZAIM SELIMOSKI.  At approximately 11:07 p.m., the investigators observed a group of people, including BEKIR SHABANI and AZEM LIMANI, leave from the residence and drive away from the area.  Investigators also observed the vehicle registered to ZAIM SELIMOSKI leave.

16.  On May 10, 2005, while law enforcement investigators were conducting a surveillance of a local restaurant, investigators observed what appeared to be drug transactions between AJDIN DZAFERI and other unknown persons in the parking lot.  The investigators observed as AJDIN DZAFERI contacted the occupants of a silver GMC Jimmy with Alaska License DZZ 362, which is registered to a Rae Ann Syverson at 1834 Juneau Street, Apartment #2, Anchorage, Alaska.  As earlier mentioned, law enforcement followed ZAIM SELIMOSKI to 1834 Juneau Street during surveillance on January 27, 2005.

17. On August 10, 2005, law enforcement investigators observed ZAIM SELIMOSKI as he drove to four different locations in Anchorage and conducted what appeared to be drug transactions with other persons. During each suspected transaction, an unidentified male or female approached ZAIM SELIMOSKI's vehicle and briefly place their hands inside the front driver's or passenger's window. These transactions lasted a few seconds, and the unidentified person would quickly remove their hands and either speak with ZAIM SELIMOSKI for a few seconds or leave. Afterward, ZAIM SELIMOSKI drove away and went to another location, where a similar transaction occurred. In particular, at another local restaurant in Anchorage, investigators observed a similar suspected drug transaction take place between ZAIM SELIMOSKI and a person law enforcement later identified as Rae Ann Syverson.

18. On October 10, 2005, law enforcement investigators were conducting surveillance of ZAIM SELIMOSKI and observed as he sat parked in a large shopping center parking lot when the investigators saw a white Subaru park next to ZAIM SELIMOSKI's vehicle. The Investigators observed a female who had been near ZAIM SELIMOSKI's vehicle get into the Subaru, after which both vehicles then drove out of the parking lot. To the investigators, the nature of the interaction between ZAIM SELIMOSKI and the occupants of the Subaru appeared to be a

drug transaction. Several minutes later, the Anchorage Police Department conducted a traffic stop on the Subaru and identified the occupants. On October 13, 2005, investigators interviewed a person who had been one of the occupants of the Subaru on October 10. The occupant became FBI3. FBI3 confirmed that ZAIM SELIMOSKI, who had sold FBI3 cocaine in the past, had sold $40.00 worth of cocaine to another occupant of the Subaru on October 10, 2005.

19. On November 4, 2005, law enforcement instructed DEA1 to go to a local bar to engage ZAIM SELIMOSKI in conversation. DEA1 told your affiant that he/she had not been able to meet with ZAIM SELIMOSKI. However, DEA1 did meet an Albanian male who, identified himself as "JOE" to DEA1 and who had agreed to sell DEA1 cocaine. DEA1 was shown an Alaska Operators License picture for AJDIN DZAFERI, and DEA1 identified AJDIN DZAFERI as "JOE" the person DEA1 had met at the bar and who agreed to sell DEA1 cocaine. AJDIN DZAFERI had provided DEA1 with the telephone number of (907) 230-7066 as the means to contact him to arrange cocaine deals.

20. On November 4, 2005, at approximately 10:30pm, DEA1 placed a consensually monitored telephone call to AJDIN DZAFERI by calling (907) 230-7066. During the call, AJDIN DZAFERI agreed to sell DEA1 cocaine. DEA1 met AJDIN DZAFERI at the agreed upon location where AJDIN DZAFERI sold DEA1

two and a half grams of cocaine powder for $250.00. Laboratory analysis confirmed the presence of cocaine in this drug exhibit.

21. On November 8, 2005, DEA1 placed another consensually monitored telephone call to AJDIN DZAFERI at (907) 230-7066. During the call, AJDIN DZAFERI agreed to sell DEA1 $500.00 worth of cocaine. AJDIN DZAFERI met DEA1 and sold five grams of cocaine powder for $500.00. Laboratory analysis confirmed the presence of cocaine in this drug exhibit. After the transaction, law enforcement followed AJDIN DZAFERI to his residence at 5050 Anne Hathaway, Anchorage, Alaska. A review of telephone records for AJDIN DZAFERI revealed that on November 8, 2005, AJDIN DZAFERI had two contacts with a telephone listed to ZAIM SELIMOSKI, and one contact with (907) 360-3582, the number BEKIR SHABANI had provided DEA1 on February 9 but which is also listed as being subscribed to AJDIN DZAFERI.

22. On December 5, 2005, DEA1 placed another consensually monitored telephone call to AJDIN DZAFERI at (907) 230-7066. During the call, AJDIN DZAFERI agreed to sell DEA1 $500.00 worth of cocaine powder. AJDIN DZAFERI subsequently met DEA1 and sold approximately five grams of cocaine powder for $500.00. Laboratory analysis confirmed the presence of cocaine in this drug exhibit. After the transaction, law enforcement followed AJDIN DZAFERI

as he traveled directly to 5050 Anne Hathaway, Anchorage, Alaska. During the monitored transaction, DEA1 had asked AJDIN DZAFERI if DEA1 could buy an ounce of cocaine from him and inquired as to the purchase price. AJDIN DZAFERI told DEA1 the price would be $1,200.00.

23. On December 8, 2005, AJDIN DZAFERI called DEA1, from (907) 230-7066, and asked if DEA1 still wanted to "get it" (the one ounce of cocaine, previously discussed during the December 5, 2005 deal). AJDIN DZAFERI wanted to know if DEA1 was still interested because he would need to make arrangements to obtain the cocaine. DEA1 told AJDIN DZAFERI he/she still wanted the cocaine but wasn't able to meet until after work. AJDIN DZAFERI reiterated to DEA1 that he needed to know so he could place the order for it. DEA1 told AJDIN DZAFERI that he/she would call him after work. At approximately 7:00pm, DEA1 placed a phone call to AJDIN DZAFERI at (907) 230-7066. AJDIN DZAFERI later met DEA1 at a local restaurant and sold DEA1 one ounce of cocaine powder for $1,200.00. Laboratory analysis confirmed the presence of cocaine in this drug exhibit. After the deal, law enforcement followed AJDIN DZAFERI as he drove directly back to 5050 Anne Hathaway, Anchorage, Alaska.

24. On December 28, 2005, DEA1 placed a consensually monitored telephone call to AJDIN DZAFERI at (907) 230-7066 to arrange the purchase of one ounce of cocaine. During this call, AJDIN DZAFERI informed DEA1 that he could complete the deal the following day. On December 29, 2005, your affiant instructed DEA1 to send a text message to AJDIN DZAFERI at (907) 230-7066. DEA1 entered a message that read "Jo is 1200 going to be ok same place in 15 min." This meant that DEA 1 would be ready to purchase one ounce of cocaine for $1,200.00 in 15 minutes and meet at the same place where they did the last transaction. DEA1 later placed another consensually monitored telephone call to AJDIN DZAFERI at (907) 230-7066 who agreed to meet with DEA1 and to sell approximately one ounce of cocaine for $1,200.00. AJDIN DZAFERI set the meeting location at the same restaurant as the deal on December 8, 2005. AJDIN DZAFERI met DEA1 and sold DEA1 approximately one ounce of cocaine for $1,200.00. Laboratory analysis confirmed the presence of cocaine in this drug exhibit. After the deal, law enforcement followed AJDIN DZAFERI as he drove directly to 5050 Anne Hathaway, Anchorage, Alaska.

25. On February 21, 2006, DEA1 placed a consensually monitored telephone call to AJDIN DZAFERI and spoke to AJDIN DZAFERI to arrange the purchase of one ounce of cocaine. During the call, AJDIN DZAFERI agreed to

sell DEA1 the ounce on the following day.  On February 22, 2006, AJDIN
DZAFERI met DEA1 in the parking lot of a local restaurant and sold DEA1 one
ounce of cocaine for $1,200.00.  Laboratory analysis confirmed the presence of
cocaine in this drug exhibit.  During the deal, DEA1 asked if AJDIN DZAFERI
could supply two ounces of cocaine during future deals.  AJDIN DZAFERI told
DEA1 that he could supply that amount, but that DEA1 would have to call one day
in advance to allow him sufficient time to obtain that amount for such deals.

26.   On March 23, 2006, DEA1 placed a call to AJDIN DZAFERI at (907)
230-7066 to arrange to have him sell three ounces of cocaine to an undercover
officer acting as DEA1's girlfriend.  During the call, AJDIN DZAFERI agreed to
sell the undercover officer the three ounces.  This was not recorded but a toll
analysis of phone calls was later conducted to confirm the call had taken place.
Later that day, AJDIN DZAFERI met the undercover officer in a parking lot of a
local restaurant and sold the undercover three ounces of cocaine for $3,600.00 of
prerecorded government buy funds. Laboratory analysis confirmed the presence of
cocaine in this drug exhibit. During the deal, the undercover asked if AJDIN
DZAFERI could supply an additional quantity of cocaine the following day.
AJDIN DZAFERI told the undercover that he could but needed a few hours notice
to allow him time to obtain the cocaine.

27. On March 24, 2006, the undercover officer placed a call to AJDIN

DZAFERI at (907) 230-7066 to arrange the purchase of eight ounces of cocaine.

Later that day, AJDIN DZAFERI met the undercover officer in a parking lot of a

local restaurant and told the undercover officer to follow him back to his residence.

The undercover officer followed AJDIN DZAFERI to 5050 Anne Hathaway,

Anchorage, Alaska and pulled into the driveway in front of the residence. Another

vehicle bearing Alaska license CTG 963 pulled into the driveway and an unknown

Hispanic male subject exited his vehicle carrying a gray paper bag and met with

AJDIN DZAFERI inside the garage. AJDIN DZAFERI returned to the undercover

and sold eight ounces of cocaine for $8,800.00 of prerecorded government buy

funds. Laboratory analysis confirmed the presence of cocaine in this drug exhibit.

This Hispanic Male was later identified through surveillance and toll analysis to be

Michel Figueroa-Ramos also known as Morano Lazardo-Sanchez.

28. On March 28, 2006, AJDIN DZAFERI spoke with the undercover

officer, telephonically which was recorded. AJDIN DZAFERI advised he was

leaving town and that the undercover could contact his friend "JIMMY" for future

purchases. AJDIN DZAFERI stated he was giving his telephone, (907) 230-7066,

to "JIMMY" who would then be taking over his drug business until he got back

into town. AJDIN DZAFERI also advised he would contact "JIMMY" and advise him that the undercover officer would be contacting him for purchases of cocaine.

29. Later that same day, AJDIN DZAFERI telephonically contacted the undercover officer and stated he was going to keep his telephone and that the undercover could contact "JIMMY" at **(907) 250-8322 the TARGET TELEPHONE**.

30. On March 29, 2006, the undercover officer placed a recorded telephone call to the **TARGET TELEPHONE**.   When a male answered the phone, the undercover officer asked for "JIMMY".  The male stated that he was "JIMMY" and the undercover officer stated his/her name and told him that "JOE" (AJDIN DZAFERI) told her to call "JIMMY" (later identified as GZIM VESELI).  The undercover officer asked GZIM VESELI if he would meet him/her for lunch the next day, so they could talk about "business" (cocaine transactions.)  GZIM VESELI agreed, and told the undercover officer to call him anytime.

30. On March 30, 2006, the undercover officer placed a recorded telephone call to the **TARGET TELEPHONE**.  During the telephone call, the undercover officer asked GZIM VESELI if he wanted to meet for lunch.  GZIM VESELI agreed and advised he would be arriving in a black Daewoo automobile.  They then met at Applebee's Restaurant on Tudor Road in Anchorage.  During their

ensuing conversation, GZIM VESELI told the undercover officer he was an

"Albanian from Macedonia," that he traveled back and forth from Macedonia to

the United States, and had done so for the last eight years. GZIM VESELI told the

undercover officer that Ajdin DZAFERI (who he referred to as 'Joe') was his

uncle. The undercover officer asked GZIM VESELI if he was "taking Joe's (Ajdin

DZAFERI) place" while he was absent from Anchorage area, and he confirmed

that he was. The undercover officer told GZIM VESELI she paid "Joe" $1,100.00

per ounce and inquired how much GZIM VESELI would charge per ounce of

cocaine. GZIM VESELI stated his price would be $1,200.00 per ounce. The

undercover officer told GZIM VESELI the quality of the cocaine she had

purchased from "Joe" in the past was good, and asked if GZIM VESELI's cocaine

was the "same as Joe's." GZIM VESELI told the undercover officer it was the

same. GZIM VESELI also told the undercover officer he would be the only one

the undercover office would meet when purchasing cocaine from him. The

undercover officer asked GZIM VESELI if he had other relatives who resided in

the United States, and he replied he had relatives who lived in Anchorage,

Chicago, and other areas of the United States. GZIM VESELI stated that he

maintained an apartment in Anchorage with a roommate, even when he was

residing in Macedonia. GZIM VESELI told the undercover officer that his

roommate (name unknown) sold cocaine to his customers when he was traveling or when he was in Macedonia.  GZIM VESELI characterized himself to the undercover officer as being "far down the line" in relation to the local drug trafficking hierarchy.  GZIM VESELI told the undercover officer he did not make a significant amount of money from selling cocaine.  GZIM VESELI told the undercover officer he also worked as a cab driver.  GZIM VESELI told the undercover officer AJDIN DZAFERI instructed him to work with the undercover officer while he was out of town.  The undercover officer agreed to call GZIM VESELI the following day (March 31, 2006) in order to arrange a purchase of cocaine from him.  The lunch meeting subsequently ended.

31. Law enforcement observed GZIM VESELI leaving the restaurant in a 1999 black Daewoo, Alaska license plate EBB376.  The vehicle is registered to GZIM VESELI at 731 S. Bragaw, Anchorage, Alaska.  After the meeting, the undercover officer viewed an Alaska Department of Motor Vehicle Drivers License photograph and positively identified GZIM VESELI as "JIMMY."

32. On March 31, 2006, the undercover officer placed a recorded telephone call to the **TARGET TELEPHONE** and spoke to GZIM VESELI to arrange the purchase of one ounce of cocaine.  During the call, GZIM VESELI agreed to sell the undercover officer one ounce of cocaine.  The undercover officer stated to

GZIM VASELI "Hey, ahh, can you hook me up with that one that I was talking to you about yesterday?" GZIM VASELI replied "uh, ok." The undercover officer than asked GZIM VASELI if she could meet him in the "same spot as yesterday," referring to the aforementioned meeting between the undercover officer and GZIM VASELI on March 30, 2006 (See Paragraph 30). GZIM VASELI then told the undercover officer that the location suggested by the undercover officer was "too far," and subsequently agreed to meet with the undercover officer at the Costco located at 4125 Debarr Road, Anchorage, AK. After the telephone call, law enforcement observed GZIM VESELI leaving in his black Daewoo from 731 S. Bragaw. Law enforcement observed GZIM VESELI drive to the Costco parking lot on 4125 Debarr Road in Anchorage, Alaska. GZIM VESELI met with and then sold to the undercover one ounce of cocaine for $1,200.00 of prerecorded government buy funds. Laboratory analysis confirmed the presence of cocaine in this drug exhibit. After the transaction, the undercover officer asked GZIM VESELI if he could supply six ounces of cocaine. GZIM VESELI stated he could, and again reiterated he would be the one selling and delivering the cocaine. GZIM VESELI also advised he needed at least a one day notice before delivering that quantity because he did not keep that much with him at one time. Surveillance was attempted after the deal with GZIM VESELI. Surveillance agents observed GZIM

VESELI driving through the parking lot with no apparent direction and he appeared to be trying to detect any surveillance vehicles in the lot that might be attempting to follow him.

33. On April 5, 2006, the undercover officer placed a recorded telephone call to the **TARGET TELEPHONE** and spoke to GZIM VESELI to arrange the purchase of three ounces of cocaine. During the call, GZIM VESELI agreed to sell the undercover officer three ounces of cocaine. During this telephone call, the undercover officer stated to GZIM VASELI " Hey…um, you told me to call the day before, so I am, and I called to see if I can get three of them from you tomorrow." GZIM VASELI stated "Three of 'em, huh?" The undercover officer confirmed this amount, and GZIM VASELI then stated "Ummm... yeah." GZIM VASELI then expressed concerns regarding the undercover officer shipping the cocaine she planned to purchase to individuals residing outside of the Anchorage area. The undercover officer assured GZIM VASELI that she would not ship the cocaine, and further added that she planned to "get rid of" the cocaine locally. GZIM VASELI then instructed the undercover officer to call her at a later time. The undercover officer agreed and stated she would call GZIM VESELI at a later date to arrange for and complete the transaction.

34. On April 6, 2006, the undercover officer placed a recorded telephone call to the **TARGET TELEPHONE** and spoke to GZIM VESELI. The undercover officer advised he/she was not able to get the money for the cocaine purchase. GZIM VESELI told the undercover officer to call back when he/she had the money.

35. On April 7, 2006, the undercover officer placed a recorded telephone call to the **TARGET TELEPHONE** and spoke to GZIM VESELI. The undercover officer advised he/she had the money.  Later that day, GZIM VESELI met the undercover officer in the parking lot at Costco on 4125 Debarr in Anchorage, Alaska. GZIM VESELI sold the undercover officer three ounces of cocaine in exchange for $3,600.00, which were prerecorded government buy funds. Laboratory analysis confirmed the presence of cocaine in this drug exhibit.

36. As outlined above, GZIM VESELI has been identified as a member of this DTO, and posses and utilizes the **TARGET TELEPHONE (907) 250-8322** to coordinate and facilitate the distribution of cocaine.

## V. ANALYSIS OF TELEPHONE CALLS

1. From January 1, 2006, through May 15, 2006, the **TARGET TELEPHONE** has exchanged telephone calls with several different telephones for which the telephone numbers, the subscribers, and/or the listed addresses for the

subscribers have surfaced in other controlled substances investigations or have particular importance in this investigation. The following sub-paragraphs detail some of the telephone numbers which called and were called by the **TARGET TELEPHONE** from January 1, 2006 to May 15, 2006 and the intelligence or investigative information currently available.

2. A review of telephone toll records, which were obtained through the use of Administrative subpoenas for the **TARGET TELEPHONE** for the period of January 1, 2005 to May 15, 2006 reflects the following pertinent information.

3. The **TARGET TELEPHONE** is in regular contact with AJDIN DZAFERI, ZAIM SELIMOSKI, and AZEM LIMANI. The total call volume for this period is as follows: January 2006 - 338 calls, February 2006 - 1,524 calls, March 2006 - 3,451, and April 2006 – 458 calls, and May 1 thru 15 – 1487 calls.

4. The **TARGET TELEPHONE** exchanged 23 calls with (907)227-4726 subscribed to by ZAIM SELIMOSKI, with the most recent call on May 11, 2006. FBI3 identified this number as being used by ZAIM SELIMOSKI when FBI3 called to arrange the purchase of cocaine from him. The **TARGET TELEPHONE** exchanged 80 calls with (907) 227-6699 with the most recent call on May 11, 2006, which is also subscribed to by ZAIM SELIMOSKI.

5. The **TARGET TELEPHONE** exchanged 21 calls with (907)230-7066 subscribed to by AJDIN DZAFERI, with the most recent call on March 28, 2006. DEA1 identified this number as being used by AJDIN DZAFERI when DEA1 called to arrange the purchase of cocaine from him.

6. The **TARGET TELEPHONE** has had contact with a cell phone subscribed to by AZEM LIMANI, including 6 calls to (907)727-9482 with the most recent call on March 28, 2006.

7. A toll analysis of AJDIN DZAFERI (907) 230-7066 was conducted which showed contacts between AJDIN DZAFERI and Michel Figueora-Ramos (907) 350-5956 during at least 3 controlled buys. It is believed That Michel Figuroa-Ramos was a source of supply for AJDIN DZAFERI. However, toll analysis between the **TARGET TELEPHONE** and Michel Figueroa-Ramos (907) 350-5956 to date has shown no contacts. Based on this information and surveillance, it is believed that Michel Figueroa-Ramos was a source of supply for AJDIN DZAFERI but not for GZIM VESELI the user of **TARGET TELEPHONE**.

## VI. CONCLUSION

1. Based upon the information as set forth above, your affiant believes GZIM VESELI lives in Anchorage, Alaska. Based on physical surveillance,

consensually recorded telephone calls, and from cooperating witnesses and sources, your affiant believes NEDZAT MIFTARI, GZIM VESELI, AJDIN DZAFERI, ZAIM SELIMOSKI, BEKIR SHABANI, and others are members of a cocaine trafficking organization operating in Anchorage, Alaska. Your affiant further believes GZIM VESELI is using the **TARGET TELEPHONE** to facilitate his drug trafficking activities.

2. Based on toll record analysis of the **TARGET TELEPHONE**, your affiant believes GZIM VESELI is contacting his associates, other members of the organization, couriers, and sources of supply, via the **TARGET TELEPHONE**. Additionally, your affiant believes other members of this organization are also using cellular telephones, as well as pre-paid cellular telephones that do not require identifying information to be given by the subscriber of the telephone service. For example, the **TARGET TELEPHONE** has called or received calls from telephones with either no subscriber information available, or false identification provided to the service carrier.

3. In sum, your affiant believes the **TARGET TELEPHONE** is being used and will continue to be used to facilitate this organization's drug trafficking activities, and that the interception of wire communications over the **TARGET**

**TELEPHONE** will assist in further identifying GZIM VESELI's drug trafficking and source(s) of supply and/or superior(s) within the DTO.

## VII. NEED FOR INTERCEPTION

1.  The interception of wire communications over the **TARGET TELEPHONE** is necessary, as normal investigative procedures have been tried and have failed, or appear reasonably unlikely to succeed if tried, or are too dangerous to be used to meet the goals of this phase of the investigation. These investigative procedures are detailed below. Traditional methods of investigation will not entirely accomplish the stated goals, which include (but are not limited to) discovering: (a) the identities of all of the individuals involved in this DTO; (b) the exact roles of these various individuals; (c) the full identification and methods of operation of the persons providing controlled substances to this organization; (d) the locations where members of the organization store their controlled substances; (e) the methods by which the members of the organization transport and distribute their controlled substances; and, (f) the methods by which the organization's members launder, distribute, or conceal the assets acquired as a result of their drug trafficking activities.

2.  It has been your affiant's experience during the course of this investigation that members of the DTO are careful about introducing members of

the organization to new individuals. The distributors maintain control of the

organization and negotiate transactions themselves thereby limiting the upper

management's exposure.

3. The following is a list of the investigative techniques that have been used,

or that your affiant has considered using, to date in this investigation, along with an

explanation as to why these techniques are not likely to succeed in identifying the

full nature and scope of this conspiracy.

## VIII. ALTERNATIVE INVESTIGATIVE TECHNIQUES

### A. PHYSICAL SURVEILLANCE

1. The location of the residences of NEDZAT MIFTARI, GZIM VESELI,

AJDIN DZAFERI, ZAIM SELIMOSKI, and of AZEM LIMANI has hindered

surveillance activities in these areas. NEDZAT MIFTARI's use of surveillance

cameras outside of one of his residences has further hampered the effectiveness of

surveillance of this particular residence. Both ZAIM SELIMOSKI and AZEM

LIMANI live on cul-de-sacs. The location of these residences in residential

neighborhoods makes traditional surveillance difficult, if not impossible.

Surveillance of any of these residences would likely result in detection or

compromise of law enforcement officers, and thus, the investigation itself.

2.    During this investigation physical surveillance was conducted to

include before and after controlled buys. While conducting surveillance of GZIM
VESELI, the surveillance teams observed him driving through a parking lot with
no apparent direction. The agents observations of GZIM VESELI was that he was
driving around to observe if anyone was trying to follow. The surveillance was
terminated for fear the investigation could be comprised. Surveillance was
conducted on other members on this organization without success.

     3.     While conventional, physical surveillance has proven valuable in
identifying some of the activities of the DTO, it has failed to accomplish the
objectives of this investigation. Specifically, it has failed to identify other
members of the organization in this or other districts and jurisdictions, "stash"
houses or cache locations for controlled substances and money and risks exposing
the investigation due to members utilizing counter surveillance driving tactics.
Furthermore, physical surveillance is unlikely to conclusively establish the roles of
the Target and or Expected Interceptee, to identify additional conspirators, or to
otherwise provide evidence sufficient to permit prosecution of all members of the
organization. Additionally, without positively knowing the reason for meetings
between individuals or why they are entering or exiting locations being surveilled,
physical surveillance is of limited use. Furthermore, additional or prolonged
physical surveillance operations may again be detected and compromise the

250-8322
Affidavit

investigation or are too dangerous to employ.

## X. CONFIDENTIAL SOURCES

1. In addition to the confidential sources described above, law enforcement investigators have interviewed other confidential sources during the course of this investigation; however, these sources do not have information about, or access to the Target and or Expected Interceptee to the extent necessary to achieve the stated goals of this investigation. Other than the confidential sources discussed in this affidavit, your affiant does not know of any other individual who could act successfully as a confidential source in this investigation, either now or in the future, due in part to the fact that your affiant has not been able to identify all of the members of the organization.

2. Based upon your affiant's experience conducting investigations of drug trafficking organizations, and this organization in particular, your affiant believes that it is highly unlikely that an informant would ever be able to gain enough access to learn about the full nature and scope of the organization, the role each participant plays, the source(s) of supply for controlled substances, the methods of distribution for the controlled substances, or the means of distributing and concealing the proceeds and assets. Further, due to what appears to be distrust of others by the members of this DTO for those who do not share the same the ethnic

background, native language, or close family ties as the Target and or Expected

Interceptee, it is unlikely that a confidential source would be able to infiltrate the

organization other than as a street level or at most a mid level purchaser.

3. Since the beginning of the investigation, none of the cooperating sources

have not spoken to nor had a 'face-to-face' meeting with the person or persons who

are supplying the Target and or Expected Interceptee from whom law enforcement

has purchased cocaine. On one occasion your affiant attempted to have DEA1

contact BEKIR SHABANI in order to identify more members of the organization

and each time he directed DEA1 to deal with NEDZAT MIFTARI. Therefore,

your affiant does not believe the cooperating sources could successfully infiltrate

this organization to the extent necessary to accomplish the stated goals of this

investigation.

4. The following describes other sources the investigation has developed

and the inability of these other sources to infiltrate the DTO or develop contacts

with the sources of supply for the DTO.

**FBI1**

I.    From March 28, 2005 to date, a witness cooperating with the FBI in

Anchorage, hereafter referred to as FBI1, has provided assistance and information

to this investigation corroborated by (a) toll record analysis; and (b) consensually

recorded conversations in which cocaine trafficking was discussed.  Your affiant believes the information FBI has provided is reliable.

ii.    FBI1 identified a number of suspects in this case known by law enforcement to be drug traffickers and participated in consensually recorded conversations with two of the subjects of this general investigation.  FBI1 also identified telephone numbers used by Anchorage area drug traffickers subsequently corroborated by other sources of information.  FBI1 is working for mitigation of sentence or possible avoidance of prosecution for state and federal drug trafficking activities.  FBI1 has been compensated for financial expenses incurred during FBI1's involvement in this investigation.

iii. According to Alaska Public Safety Information Network (APSIN), FBI1's known criminal history is as follows:  FBI1 has multiple misdemeanor and felony convictions from 1985 to 2005.  FBI1 has the following state felony drug related convictions: 1985 - Dangerous Drugs; 1992- Dangerous Drugs; 1995- Promoting Contraband; and 2003 -Controlled Substance 4th degree, Possess IA, IIA.  FBI1 has the following other state felony convictions of 1986 - Larceny; and 1988 - Weapon Offenses.  FBI1 has the following multiple state misdemeanor convictions: 1985 - DWI; 1986 - Carry conceal weapon; 1986 - Shoplifting; 1986 - Failure to appear ; 1986- Shoplifting; 1990 -Resisting Arrest; 1998 - Driving while

Intoxicated; 1998 - Making a False Report; 1998 - Shoplifting; 2001 - Driving

while License revoked/suspended/limited; 2001 - Theft by Shoplifting; 2002 -

Vehicle theft 1st degree; 2003 - theft 3rd degree/ value $50.00-$499.00; and 2005 -

Theft of lost Property.  FBI1 has provided information on other cases which has

been proven reliable.  The investigators have corroborated FBI1's information

through the use of recorded telephone calls, law enforcement indices checks,

surveillance, telephone toll analysis, and information gleaned from other law

enforcement sources of information.

　　　iv.  Between  March 29 and May 17, 2005, FBI1 has made a series of

controlled purchases of cocaine from individuals law enforcement suspects are

related to the DTO, but who at this time law enforcement has been unable to

connect to the **TARGET TELEPHONE** or the TARGETS.  FBI1 has not been

able to meet or identify the source of supply for the individuals from whom FBI1

has purchased cocaine or for the DTO.

　　　**FBI2**

　　　I. From June 1, 2005 to the present, a witness cooperating with the FBI in

Anchorage, hereafter referred to as FBI2, provided assistance and information in

relation to this investigation.  The information provided by FBI 2 was corroborated

by (a) toll record analysis; and (b) consensually recorded conversations in which

cocaine trafficking was discussed.  Your affiant believes the information FBI2 has provided is reliable.

ii. FBI2 identified a number of suspects in this case known by law enforcement to be Anchorage area drug traffickers and participated in consensually recorded conversations with two of the subjects of the overall investigation in this matter, but not from the Target and or Expected Interceptee identified in this affidavit.  FBI2 also identified telephone numbers used by drug traffickers that were corroborated by other sources of information.  FBI2 was not paid for his/her services.

iii. FBI2 is working for mitigation of sentence or possible avoidance of prosecution for state and federal drug trafficking activities.  According to Alaska Public Safety Information Network (APSIN), FBI2's known criminal history is as follows: 2003 - Felony Assault 3rd degree/ cause injury with weapon; and 2004- Misdemeanor Destroy/Disconnect communications.

iv. Between June 1 and July 7, 2005, FBI2 made a series of controlled purchases of cocaine from individuals law enforcement suspects are related to the DTO, but who at this time law enforcement has been unable to connect to the **TARGET TELEPHONE** or the Target and or Expected Interceptee.  FBI2 has not

been able to meet or identify the source of supply for the individuals from whom FBI2 has purchased cocaine or for the DTO.

**FBI4**

I. From August 24, 2005 to date, a witness cooperating with the FBI in Anchorage, hereafter referred to as FBI4, provided assistance and information to this investigation. The information provided by FBI4 was corroborated by (a) toll record analysis; and (b) consensually recorded conversations in which cocaine trafficking was discussed. Your affiant believes the information FBI4 has provided is reliable.

ii.    FBI4 has identified a number of suspects developed during this investigation and known by law enforcement. FBI4 has not been paid for his/her services. FBI4 is working for mitigation of sentence or possible avoidance of prosecution for state and federal drug trafficking and gambling activities. These drug trafficking activities are State of Alaska pending 2005 state felony charges for Misconduct involving a Controlled Substance, in the third degree, Misconduct involving a Controlled Substance in the fourth degree, and Misconduct involving Weapons, second degree.    FBI4 also incurred a misdemeanor State of California conviction for Inflicting Corporal Injury to a Spouse/Cohabitant.

iii. FBI4 has provided information about the illegal gambling activities of individuals suspected of being involved in the criminal activities law enforcement is investigating in this matter and who law enforcement suspects are related to the DTO, but who at this time law enforcement has been unable to connect to the **TARGET TELEPHONE** or the Target and or Expected Interceptee. FBI4 has not provided any information that would indicate FBI4 knows who may be supplying the DTO with controlled substances.

## X. UNDERCOVER AGENTS

1. During this investigation law enforcement has been able to only introduce one undercover officer through DEA1 and attempted to introduce without success two different undercover agents through FBI1 and FBI3. At the present time, there has been no additional opportunity to introduce an undercover agent to penetrate this drug trafficking organization. Currently the undercover officer purchasing cocaine from GZIM VESELI has been advised by GZIM VESELI on more than one occasion that the undercover officer would only be able to deal with him. Moreover, even if this were to occur, it is highly unlikely an undercover officer or agent would be allowed to meet each and every member of the organization and, therefore, would not be able to uncover the full nature and scope of the conspiracy.

2. Finally, as indicated herein, past experience has shown that members of this organization are very cautious in relation to those with whom they communicate, and they are suspicious and generally unwilling to meet new individuals except as mere purchasers.

## XI. INTERVIEWS

1. As mentioned above, at least one of the confidential sources is a Target and or Expected Interceptee and another is potentially subject to criminal prosecution for crimes related to the illegal activities of the DTO. Neither of these two members of the criminal organization provided any self incriminating information about their own involvement in criminal activity. This investigation has not reached a point where law enforcement could interview the members of the DTO with the expectation that these persons would provide complete information about the DTO's criminal activities. Furthermore, were these members to be interviewed at this point, it is also likely they would alert other members of the DTO to the renewed interest of law enforcement in them and there by compromise the investigation.

2. DEA3, who law enforcement suspects may be involved in laundering criminally derived proceeds, provided only limited information about NEDZAT MIFTARI's role as a distributor or who was supplying him with cocaine. DEA3

did not volunteer any additional information regarding his/her role or that of any other member of the organization.

3. DEA4 provided information about the drug trafficking activities of some of the Target and or Expected Interceptee but provided no information about DEA4's own involvement in the DTO. Law enforcement has developed probable cause to believe DEA4 is an active participant in the drug trafficking activities of the DTO. Therefore, law enforcement does not anticipate that DEA4 would provide a full and complete description of the DTO's criminal activities if law enforcement were to attempt any future interviews prior to the issuance of an indictment in this case. To date, DEA4 has not provided any further assistance to this investigation.

4. Law enforcement has interviewed suspected customers of distributors of the DTO as a method of gaining further evidence of drug trafficking and money laundering activities. It was anticipated that interviews of the customers would allow the investigation to move up the organization's ladder and identify additional members. Although some useful information was obtained, none of the information has allowed the goals of this investigation to be met. Further, this technique was eventually abandoned as unwieldy, dangerous, and likely to eventually disclose the existence and scope of the investigation.

## XII. SEARCH WARRANTS

1. This investigation has not led to a point where search warrants for drug related evidence could be executed on packages, residences and other locations affiliated with members of this organization.

2. Based on the investigation to date, while law enforcement has developed probable cause to potentially search the residences of GZIM VESELI, AJDIN DZAFERI and one of NEDZAT MIFTARI's residences for documents related to drug trafficking, your affiant does not know the exact extent to which any of these individuals are using these residences and whether any of these residences contain controlled substances and/or controlled substances proceeds, or any information that would identify the source of supply for the cocaine. Therefore, at this time, your affiant does not know of any locations associated with the Target and or Expected Interceptee where a search warrant could be successfully executed or that would likely produce sufficient evidence to charge and prosecute the majority of the participants involved in this drug trafficking organization.

3. Furthermore, based on your affiant's experience investigating drug trafficking organizations, your affiant believes the execution of a search warrant on any now known members of this organization would effectively terminate the investigation, as it would advise the Target and or Expected Interceptee and their

associates of the existence of the investigation, and likely cause them to alter their behavior patterns or flee to avoid prosecution.

4. It is your affiant's belief that it would be more productive to execute search warrants at the end of the investigation, once the stated goals of the investigation have been substantially achieved, locations identified and there is a better chance of dismantling this organization.

## XIII. TRASH SEARCHES

Law enforcement considered conducting trash searches of NEDZAT MIFTARI's apartment at which he sold DEA1 cocaine on several occasions, but this proved difficult because he lives in a six unit apartment building that has dumpster service in which the trash from all occupants of the building is commingled. In addition, law enforcement considered conducting a trash search at GZIM VESELI's residence, but this proved difficult as he also lives in an apartment building that has a dumpster service in which the trash from all occupants of the building is commingled. Law enforcement attempted trash searches at the residences of NEDZAT MIFTARI's brother, ZAIM SELIMOSKI's, and AJDIN DZAFERI's residence. While the trash searches of these residences yielded some information, it is insufficient to provide any additional targets or avenues for investigation. As your affiant does not know if or how many others

individuals are involved, some of whom could be living next to or near the targets of this investigation, the potential risk of detection outweighs the benefits of trash searches at other locations.

## XIV. GRAND JURY SUBPOENAS

1. At this stage of the investigation, your affiant believes issuing grand jury subpoenas to the Target and or Expected Interceptee, or other individuals believed to be either involved in this conspiracy or associated with those involved, would not result in achieving the stated goals of this investigation. The Target and or Expected Interceptee and their associates, should they be called to testify before the grand jury, would likely be uncooperative, lie, or invoke their Fifth Amendment privilege not to testify. In your affiant's experience, it is not reasonable to believe that the Target and or Expected Interceptee would simply agree to incriminate themselves under oath.

2. Additionally, issuing grand jury subpoenas would have the effect of alerting the members of the conspiracy, thereby compromising the investigation and resulting in the possible destruction or concealment of documents and other evidence.

3. Grants of immunity would not be appropriate at this stage in the investigation because immunity could foreclose the prosecution of principal

members of this conspiracy and would not ensure the receipt of truthful testimony before the grand jury. As with grand jury subpoenas, it is not logical to believe that the Target and or Expected Interceptee would simply agree to incriminate themselves, even if presented with the possibility of immunity.

4. There is no basis to believe that the use of grand jury subpoenas or immunity is currently feasible in this case. For the foregoing reasons, use of grand jury subpoenas and immunity continues to be unlikely to advance the government's investigative objectives.

5. Your Affiant has also discussed this matter with AUSA Stephan Collins and DEA G/S Mark Payne, and they concur that issuing Grand Jury Subpoenas and/or granting immunity at this point would be unlikely to achieve the goals of this investigation.

## XV. TELEPHONE TOLL RECORDS AND PEN REGISTERS

1. The use of toll records has proven to be beneficial in this investigation. Based upon analysis derived from pen register information conducted on other members of the organization and supplemented with the consensual recordings of the cooperating sources, your affiant believes GZIM VESELI is using **TARGET TELEPHONE**. Your affiant further believes GZIM VESELI will continue to use

**TARGET TELEPHONE** to conduct his drug trafficking activities.  No trap and trace devices have been used.

2.  Past telephone activities of members of drug trafficking organizations show they often use pre-paid telephones that do not require subscribers to provide identifying information to the carrier of the telephone service, or permit the use of false identification in not requiring such identifying information.

3.  Data derived from the analysis of toll record information has assisted law enforcement officers in identifying other members of the DTO and some of the telephone numbers that are in contact with the **TARGET TELEPHONE**. However, this derived data is limited in that other members of this organization are believe to be use pre-paid telephones that do not require subscribers to provide identifying information to the telephone service provider.  Specifically, during tolls analysis, pre-paid calling cards have been used by more than one member of this organization. Therefore, even nominee subscriber information is unavailable to several of the telephones that are in contact with **TARGET TELEPHONE**.

4.  While your affiant has been able to obtain subscriber information for some of the numbers called by the **TARGET TELEPHONE**, the identification of these subscribers are of limited value as many of these telephones are subscribed to by nominees.  Toll records alone have not assisted greatly in identifying other

members of the organization, associates, customers, stash locations, or methods of operation used by the organization.

5. In order to gather sufficient evidence to support a prosecution, it is necessary to know the contents of the calls made to and from the **TARGET TELEPHONE**. The contents of the calls would assist your affiant in learning the true identities of the traffickers, the nature and scope of the organization, the roles of the various participants in the organization, the source(s) of supply of the controlled substances, the locations of stash houses, the methods of distributing the controlled substances, and the methods and means of distributing and concealing the assets acquired from their drug trafficking activities. Further, the content of the conversations would aid your affiant in determining when the use of other investigative techniques, such as surveillance and search warrants, would be beneficial and appropriate.

## XVI. FINANCIAL INVESTIGATION

1. No Target and or Expected Interceptee have been followed to or have been observed at any banks or other financial institutions to date. Mail watches have been instituted to help identify the sources and uses of their illicit proceeds with negative results.

2. Your affiant has not yet obtained tax returns or credit reports on all of

250-8322
Affidavit

the Target and or Expected Interceptee, but your affiant is in the process of requesting them. The return of some of this information often takes several months. While obtaining tax returns, credit reports or other financial information may be helpful in tracing illicit proceeds collected by the Target and or Expected Interceptee, it is highly unlikely that the information will lead to the identification of other members of the conspiracy.

3. A search of Western Union data bases revealed that individuals suspected of assisting the DTO have used this as a means of transferring monies. Records indicate that a number of associates have transferred monies totaling $31,955.00 out of the Untied States to Kicevo or Kercov, Macedonia.

4. From approximately 2000 to present, AZEM LIMANI and individuals and entities associated with him have been involved in the purchase of over 10 properties in Anchorage, Alaska by obtaining loans totaling over three million dollars. The majority of the financing for these properties has come from local financial institutions or mortgage companies. Based on a review of the applications, bank records, income tax returns, and other relevant documents, it appears that a substantial portion of these loans have been obtained based on false financial information being provided to the lending institution by AZEM LIMANI and by nominee buyers acting for him.

250-8322
Affidavit                    Page 65 of 74

5.  Based on a review of associated bank accounts, many of these loans appear to have been paid on with the proceeds from other loans.  In most instances the properties are flipped between involved individuals in a short time period and a new mortgage obtained, generally at a higher value, before the loans fall too far behind and are foreclosed.  In at least five instances, the involved individuals have defaulted on the loans.  Furthermore, the participants in the loans are involved in an organized manner and appear to be assisting each other.

6.  For example, on or about March 4, 2002, AZEM LIMANI applied for and received a loan from Ameriquest for the property located at 5311 E. 22nd in Anchorage, Alaska.  On the loan application for Ameriquest, AZEM LIMANI listed his income as $30,520.74 per month while working at Alaska Super Pawn.  For comparison, on AZEM LIMANI's 2002 tax return provided to the Internal Revenue Service (IRS), AZEM LIMANI listed his total wages from Alaska Super Pawn at $60,000 for the entire 2002 calendar year ($5,000 per month).

7.  From at least October 7, 2003 through May 14, 2004, AJDIN DZAFERI's American Express Credit Card was used to purchase construction materials, totaling over $58,100, and for expenses related to a pawn shop AZEM LIMANI owned totaling $13,200.  During this time, AJDIN DZAFERI had no known construction company or business relationship with AZEM LIMANI or the pawn

shop he owned. In addition, during this time frame, AZEM LIMANI paid AJDIN DZAFERI's credit card bill totaling over $41,000.

8. On November 10, 2004, AJDIN DZAFERI, using the name of AJDIN DZAFEROSKI, paid by check $7,000.00 to AZEM LIMANI. Again, law enforcement has no information that would support a legitimate business connection between AJDIN DZAFERI and AZEM LIMANI during this time.

9. On May 7, 2004, AGIM DELLOLI signed a Residential Mortgage loan application for 7250 Cantonment Court listing his income at $1,577 per month as a tile installer, which job he claimed to have held for the past two years. AGIM DELLOLI listed his Wells Fargo account balance at approximately $8,000.

10. On October 28, 2004, AGIM DELLOLI obtained loans totaling $368,900 from Countrywide Home Loans for a residence in Anchorage. On the loan application, AGIM DELLOLI listed his income as $24,000 per month along with $100,000.00 in a Wells Fargo savings account. Based on review of bank documents and tax returns submitted by AGIM DELLOLI, these statements about AGIM DELLOLI's income and savings are false. AGIM DELLOLI's employment was listed as a construction worker for the past ten years.

11. On February 3, 2005, AGIM DELLOLI signed a Power of Attorney authorizing AZEM LIMANI to sign AGIM DELLOLI's name in real estate

transactions. On that same day, AZEM LIMANI signed AGIM DELLOLI's name authorizing the sale of the property purchased on October 28, 2004.

12. Drug traffickers normally conduct business on a cash basis and often do not utilize traditional banking methods. Based upon your affiant's training and experience, I also know drug traffickers normally do not file income tax returns, file false income tax returns, and/or place assets in the names of other persons to prevent them from being located and identified. At best, a financial investigation of a drug trafficker can serve to confirm the existence of unexplained wealth or unusual financial transactions. However, absent the use of other investigative methods, simply obtaining financial information cannot achieve the goals of this investigation.

## XVII. OTHER WIRETAPS

During the course of this investigation, your affiant has obtained no information regarding this DTO, the Target and or Expected Interceptee from a judicially-authorized wiretap.

## XVIII. CONCLUSION

As detailed above, normal investigative techniques have been tried and have failed, are reasonably unlikely to succeed if tried, or are too dangerous to attempt. Therefore, your affiant believes interception of communications over the

250-8322
Affidavit

**TARGET TELEPHONE** is necessary, and permission is hereby requested to

intercept wire communications of the Expected Interceptees and any other co-

conspirator(s) later identified.

## XIX. PRIOR APPLICATIONS FOR INTERCEPTION

1. This is an application seeking an order authorizing the initial

interception of wire communications to and from the **TARGET TELEPHONE**.

On May 26, 2006, checks were conducted of the FBI electronic surveillance

indices with negative results. On May 26, 2006, checks were conducted of the

Bureau of Immigration and Customs Enforcement (ICE) electronic surveillance

indices with negative results. On May 26, 2006, checks were conducted of the

Drug Enforcement Administrations electronic surveillance indices. The DEA

indices show that May 26, 2006 there were no additional applications for orders

authorizing the interception of wire, oral or electronic communications for any of

the listed Target and or Expected Interceptee, or the **TARGET TELEPHONE**.

## XX. DURATION OF INTERCEPTION

1. This affidavit is in support of an application to intercept wire

communications to and from **TARGET TELEPHONE** for a period not to exceed

thirty (30) days. The authorization given is intended to apply not only to the

**TARGET TELEPHONE** number listed above, but to any telephone numbers,

direct connect/push to talk numbers, or telephones subsequently accessed through the above-referenced International Mobile Subscriber Identity (IMSI) number and or Electronic Serial Number (ESN), and to any other IMSI or ESN numbers accessed through the **TARGET TELEPHONE** numbers referenced above within the thirty (30) day period. The service provider for the **TARGET TELEPHONE** is considered a personal communication service provider (PCS). Under PCS, telephones are inoperable until the subscriber inserts a card, encoded with IMSI number or ESN, into a slot in the telephone. IMSI numbers and ESN are unique to each subscriber.

2. As demonstrated by the facts contained in this affidavit, the drug trafficking conspiracy identified is on-going and involves the Target and or Expected Interceptee as well as other unknown individuals. This investigation seeks to prove the full scope, membership, and method of operation of the conspiracy. Therefore, your affiant requests that interception not be ordered terminated upon the first interception of a conversation regarding controlled substances trafficking, but be allowed to continue until the full scope of the conspiracy, the persons involved, and their respective roles, are determined, or for thirty (30) days, whichever comes first. It is further requested, pursuant to Section 2518(5), of Title 18 USC, that the 30 day period be measured from the day on

which investigative or law enforcement officers first begin to conduct an

interception under this court's order or ten (10) days after the order is entered,

whichever is earlier.

## XXI. MINIMIZATION

1. The requirements regarding the minimization of interception will be

strictly explained and followed. Before interception begins, a memorandum

regarding minimization, as well as a copy of the court order authorizing

interception will be provided to all monitoring agents. A copy of that order and a

minimization memorandum will also be posted at the listening site. Before an

agent begins to intercept communications, he/she will sign a form indicating that

he/she has read the affidavit, the court's order authorizing the interception, and the

minimization memorandum; is familiar with the contents of the order; has attended

a minimization meeting; and will intercept communications in compliance with the

court's order and the other guidance provided.

2. All wire communications will be minimized in accordance with Chapter

119 of Title 18 of the United States Code. Interception will be suspended

immediately when it is determined through voice identification, physical

surveillance, or otherwise, that none of the Target and or Expected Interceptee, or

any of their confederates, when identified, are participants in the conversation,

unless it is determined during the portion of the conversation already overheard that the conversation is criminal in nature. Even if one or more of the Target and or Expected Interceptee, or their confederates, when identified, is a participant in a conversation, monitoring will be suspended if the conversation is not criminal in nature or not otherwise related to the offenses under investigation.

3. Based on information provided by other monitoring and supervising agents, your affiant believes that many controlled substances-related conversations may be part of otherwise innocent conversations. Monitoring agents will use information obtained from previous recordings of the **TARGET TELEPHONE** when determining whether a particular call should be minimized as a non-pertinent call. Lengthy conversations that appear to be non-pertinent will periodically be monitored to determine if the conversation has become controlled substances-related.

4. It is anticipated that a majority of conversations will be conducted in the Albanian language. Every effort will be made to have these conversations monitored by someone who is trained in the Albanian language or is a native speaker. However, in the event the translator is not a federal enforcement officer, the translator, whether he or she is a language-trained support employee or under contract to the government, must be under the supervision of a federal law

enforcement agent or specially deputized officer. Conversations monitored by the translator, under the guidance of a law enforcement officer, may be "minimized" by the translator and an English translation of the pertinent criminal conversations may be furnished to the Supervising Agent. In the unlikely event that the conversations are in another foreign language, or are in a dialect of Albanian with which the Albanian translators are unfamiliar, the conversation may be recorded in its entirety and will be promptly minimized by the appropriately trained foreign language translator.

5. All intercepted wire conversations will be recorded and all recordings will be securely preserved. Logs will be prepared regarding the date and time of calls, the parties involved, the subjects of the calls, and if and when minimization occurred. A report detailing the course of the interception will be filed with the court on or about every 10th day following the commencement of interception pursuant to the court's order. Particular emphasis will be placed on reporting minimization efforts to the court.

## XXII. CONCLUSION

The facts contained in this affidavit show that there is probable cause to believe that the Target and or Expected Interceptee, and others unknown, are committing violations of Title 21 and 18, as set forth above, and that the **TARGET**

**TELEPHONE** has been used and will and will continue to be used to facilitate the drug trafficking and money laundering offenses of the DTO as discussed in this affidavit, and that communications concerning those offenses will be obtained through the use of wire and electronic surveillance, authorization for which is requested herein. Normal investigative techniques have been tried and have failed, are reasonably unlikely to succeed if tried, or are too dangerous to use. Therefore, permission is hereby requested to intercept wire communications to and from the **TARGET TELEPHONE**.

I declare under penalty of perjury that the above information is true and correct.

Dated this 26 day of May, 2006 at Anchorage, Alaska.

Brian L. Balega
Task Force Agent
Drug Enforcement Administration

Sworn and subscribed to before me on the 26th day of May, 2006.

**REDACTED SIGNATURE**

JOHN W. SEDWICK
United States District Court Judge
District of Alaska